UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| JOSE O. GUZMAN, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 6:12-CV-42 |
| | § | |
| HACIENDA RECORDS AND | § | |
| RECORDING STUDIO, INC., *et al.*, | § | |
| | § | |
| Defendants. | | |

# MEMORANDUM AND ORDER

Nashville is the capital of country music. New Orleans is the birthplace of jazz. And the Mississippi Delta is home to the blues. Less famously, but no less importantly to Texans, Corpus Christi is the heart of the Tejano music scene. Docket Entry No. 120 at 149:6–7. A fusion of the Mexican and German influences in Texas, Tejano music was hugely popular in Corpus Christi from the 1970s through the 1990s. This case is about two Tejano songs that were written and performed in that time frame. Plaintiff Jose Guzman wrote "Triste Aventurera," a rollicking song about a man who rejects his ex-girlfriend's plea to take him back, in 1974. Defendant Hacienda Records and Recording Studio,[1] which specializes in Tejano music, released "Cartas de Amor" by the Hometown Boys band in 1990.

---

[1] The other Defendants in this case, Hacienda Records, L.P., Latin American Entertainment, LLC, Rick Garcia, and Roland Garcia, Sr., are all associated with Hacienda Records and Recording Studio. The parties did not distinguish between these Defendants at trial or in the post-trial proposed findings of fact that were submitted to the Court. For simplicity, the Court will refer to the Defendants collectively as Hacienda.

1

In this copyright infringement suit that he filed against Hacienda, Guzman contends that *Triste* and *Cartas* are substantially similar to one another.

From the time Guzman filed suit in September 2012, this case has been unusually acrimonious. In between resolving numerous discovery disputes, the Court has issued several substantive rulings. The Court first denied Hacienda's motion to transfer venue to Corpus Christi; denied Hacienda's motion to dismiss the case under Rule 12(b)(6); dismissed Guzman's claim under Section 1202(b) of the Digital Millennium Copyright Act, but allowed him to assert a claim under Section 1202(a) of the Act; granted Hacienda leave to file a third-party complaint against Roman Martinez, Sr., leader of the Hometown Boys[2]; and denied cross-motions for summary judgment on the copyright infringement claim.

On March 17, 2014, the Court began a three-day bench trial on the remaining claims. The two most hotly contested issues were: (1) whether Hacienda had access—that is, knew about—*Triste* prior to recording *Cartas*; and (2) whether *Triste* and *Cartas* are substantially similar. The Court's findings of fact and conclusions of law on the preliminary question of access, which resolve all of the claims in this case, are set out below.[3]

---

[2] Hacienda added Martinez to this suit at a fairly late stage in the litigation, contending that if Hacienda were held liable to Guzman, Martinez should be held liable as well. But at trial, neither party introduced any evidence that Martinez had done anything wrong or had even heard *Triste* prior to recording *Cartas*. For that reason, the Court orally entered a take-nothing judgment in his favor at the conclusion of the trial. *See* Docket Entry No. 119.

[3] Any findings of fact that are more properly conclusions of law are so deemed. And any

## I. FINDINGS OF FACT

### A. Tejano Music in Corpus Christi

The norteño style of Tejano music is a blend of German influences—including the polka, strategic use of accordion, and 2/4 meter—and Mexican musical traditions. Docket Entry No. 122 at 180:24–25, 181:1–10. Tejano music also incorporates components of popular music from the United States. *Id.* at 181:13–15. There are several other subgenres of Tejano music, including Regional and Conjunto. Docket Entry No. 121 at 67:23–24.

In the 1970s through the 1990s, Corpus Christi was the "heart" of Tejano music. Docket Entry No. 120 at 149:6–7. The city was flush with clubs dedicated to Tejano music, which had colorful names like the Club Sofia, Reyes de la Polka (Kings of the Polka), Bumblebee, and El Casino. *Id.* at 147:13–15. The bands had creative names too—among those identified at trial were Tamaulipecos de Adan Sanchez, Los Guerreros de Nasario, and Los Reyes de la Polka de sac Figueroa. *Id.* at 88:3–6. Corpus Christi also had two radio stations, KCCT and KUNO, dedicated to playing Tejano music.[4] *Id.* at 149:20–150:2. A third station, KWBU, was not exclusively a Tejano music station but frequently played Tejano songs. *Id.* at 84:2–8. The Tejano music industry peaked in the mid-1990s with the rapid

---

conclusions of law that are more properly findings of fact are so deemed.
[4] KCCT is now a country music station, which is one indication, among several, of Tejano music's gradual decline in popularity. *See* Docket Entry No. 121 at 170:6.

rise and tragic murder of superstar Selena. But "the tide sank" in the years that followed and Tejano music's popularity is currently at a low point. Docket Entry No. 121 at 170:13–16.

**B. Guzman Writes "Triste Aventurera"**

Plaintiff Jose Guzman is 92 years old. He has led a full and productive life: born and raised in Mexico, and married to his wife "just barely for 58 years," he has worked as a plumber, carpenter, electrician, and car painter. Docket Entry No. 120 at 63:19–20, 64:12–13. But his lifelong passion has been music. A drummer and composer who relocated to Robstown (just outside of Corpus Christi) in the 1970s, Guzman was a member of the group called "Los Duendes" that played Tejano music. *Id.* at 63:8–16, 77:22–25. Abel Sanchez was the band's leader, and Timoteo ("Timo") Martinez was the group's other member. Martinez left the group in 1980. *Id.* at 189:7–10.

Guzman composed "Triste Aventurera" in the early 1970s (the exact year he wrote it is unclear) based on a story his friend told him. In the norteño-style song, a woman pleads to her ex-boyfriend to take her back. The man rejects the overtures, calling her a liar and telling her that she will be sad and lonely until the day she dies. *Id.* at 67:8–23, 68:5–25. The music and lyrics to *Triste* were placed on a lead sheet and filed with the United States Copyright Office on December 9, 1974. That year, Guzman's band, Los Duendes, recorded *Triste* in Gregory,

Texas. *Id.* at 83:9–12. The group asked Oscar Serrato, the owner of Supreme Records in Corpus Christi, to make 45 recordings of the album. *Id.* The title of the album was *Triste Aventurera* and it was released on a 45 rpm record. Guzman introduced no evidence at trial of how many units the album sold.

From 1974 to approximately 1990, Los Duendes performed at dance halls, concerts, and weddings in Corpus Christi and surrounding towns. The band played twice, and sometimes three times, a week. *Id.* at 147:22–25. It is unclear how many people attended their performances. In Corpus Christi, the band played at Reyes de la Polka, Bumblebee, Yellow Rose, and other concert halls. *Id.* at 147:13–15. Guzman and Sanchez testified that when Los Duendes performed, the band played *Triste* during each performance—sometimes twice or three times. *Id.* at 82:11–13, 147:16–21. Although they testified that *Triste* was always a hit at concerts, Martinez testified that *Triste* was a popular song for the band mainly between 1974 and 1975. *Id.* at 197:8–14. At some of their shows, the band handed out promotional pamphlets that included the lyrics to *Triste*. *Id.* at 75:6–11. The band also performed once or twice in Lubbock during that sixteen-year period and played *Triste* at those performances. *Id.* at 159:25–160:8.

*Triste* received limited radio play in Corpus. Sanchez took copies of the 45 recording of *Triste* to the KUNO and KCCT radio stations in Corpus Christi soon

5

after Serrato gave him the recordings. *Id.* at 149:23–25. Sanchez testified that he heard *Triste* played on those stations, but only once a day. *Id.* at 150:6–7. He does not remember when the radio stations stopped playing *Triste*. *Id.* at 150:8–9. Guzman's deposition and trial testimony are in conflict on whether *Triste* played on the radio. In his deposition, Guzman testified that he did not hear *Triste* on the radio, but at trial he testified that he had heard it on the radio "but not real frequently." *Id.* at 123:1–9, 84:16–17. The Court found Guzman's testimony at trial to be more credible than his deposition testimony, especially because what he remembered at trial is consistent with Sanchez's independent recollection. The Court therefore finds that *Triste* was played on the radio, albeit infrequently (perhaps only once a day, if that), after 1974.

### C. Hacienda Releases "Cartas de Amor"

Defendant Hacienda Records and Recording Studio opened in 1979. Docket Entry No. 121 at 161:3–6. Hacienda's specialty is Tejano music, although it has also recorded rap, blues, and country music. *Id.* at 243:16–22. Roland Garcia, Sr. "oversees everything" and makes all of Hacienda's high level decisions. *Id.* at 161:21–25. Rick Garcia is the Executive Vice President of Hacienda. He handles the day-to-day activity at Hacienda, including licensing and production of albums. From his high school graduation in 1976 through 1979, he worked as an

6

apprentice at Freddie Records, a prominent Corpus Christi-based Tejano recording studio. *Id.* at 169:7–9.

In the early 1980s through the early 1990s, a musical group known as "El Grupo Internacional de Ricky y Jose Martinez," later known as the "Hometown Boys," performed in and around Lubbock. The band members were Roman Martinez, Sr. and his children. *Id*. at 7:8–23. In the early 1980s, the band travelled to Corpus Christi and recorded songs at Hacienda. *Id.* at 11:17–21. The band selected the songs that it wanted to record. Hacienda was not involved in that process.

In 1990, the Hometown Boys decided to record more songs at Hacienda. Docket Entry No. 122 at 26:11–14. The band informed Hacienda that one of the songs it recorded was called "Cartas de Amor." *Id.* at 27:22–28:5. The song shares the same theme as *Triste*; it is also about a man who refuses to take back his ex-girlfriend. Although Hacienda's expert described it as a more "contemporary" song than *Triste*, *id.* at 178:7–12, it utilizes many of the norteño-style approaches, such as the 2/4 polka beat, that are heard in *Triste*. Notably, the lyrics in the first verse of *Cartas*—"Yo tengo en mi poder una<u>s</u> carta<u>s</u> de amor que tu me la<u>s</u> mandaste<u>s</u> pidiendo compasion (I have in my possession love letters that you have sent me asking me for compassion)"—are virtually identical to the first words of *Triste*—"Yo tengo en mi poder una carta de amor que tu me la mandaste pidiendo

compasion (I have in my possession a love letter that you have sent me asking for compassion)."

Where did this song with essentially the same opening verse as *Triste* come from? A songwriter in Lubbock named Reynaldo Peña Ortiz wrote *Cartas* and asked Ricky and Joe Martinez, sons of Roman Martinez, to record it. Docket Entry No. 121 at 16:1–21. Ortiz was a neighborhood friend of the Martinez family in Lubbock. At Hacienda's studio, the band recorded the song according to the way that Ortiz had taught it. Once it was recorded, Hacienda obtained a license to *Cartas* from Puerta Music, Ortiz's publisher in Lubbock. Docket Entry No. 122 at 31:3–32:10. The song, however, did not prove successful for the Hometown Boys. Rick Garcia, who was involved in the recording process, called it a "complete flop." Docket Entry No. 121 at 248:2–4. The fans did not request it at shows, it did not drive CD sales, and it sold no sheet music. Docket Entry No. 122 at 65:12–66:5, 87:21–89:1.

Rick Garcia, speaking on behalf of Hacienda, testified at trial that he never heard *Triste* on the radio; that no one at Hacienda had heard *Triste*; that no one had even mentioned *Triste* to Hacienda until this lawsuit; that no one had ever delivered a copy of *Triste* to anyone at Hacienda; and that he had never seen or heard of Guzman until 2012. *Id.* at 61:21–62:19, 70:4–23, 66:9–24. He also acknowledged, however, that he listened to KCCT and KUNO, the stations that

8

played *Triste*, and that he went to the same venues "where bands like [Los Duendes] played." *Id.* at 117:14–24.

**D. Guzman Hears *Cartas***

In the early 1990s, Guzman heard a band called "Los Dos Gilbertos" performing *Cartas*. Docket Entry No. 120 at 91:17–25. That band had recorded *Cartas* on an album produced by Freddie Records. *Id.* at 92:12–14. Guzman contacted Freddie Records about the song, and told them that *Cartas* was the same song as *Triste*. *Id.* at 92:19–93:1. Freddie Records sent him a check for $189.53 sometime afterwards, although the reason why was not developed at trial. *Id.* at 97:20–98:3. Many years later, on September 14, 2012, Guzman sent Hacienda Records a cease-and-desist letter, requesting that Hacienda stop unlawfully using his song and demanding an accounting for past copyright violations. Hacienda did not comply, and six days later, Guzman filed this suit.

## II. CONCLUSIONS OF LAW

### A. Copyright Infringement

#### 1. *Copyright Infringement Framework*

An action for copyright infringement requires the plaintiff to show that "(1) he owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original." *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 367 (5th Cir. 2004), *abrogated on other grounds by*

*Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010). Hacienda concedes that Guzman owns a valid copyright for *Triste*, which leaves the second element, "copying," as the primary contested issue.[5] To satisfy the copying element, Guzman must prove "(1) factual copying and (2) substantial similarity." *Id*.

Factual copying "can be proven by direct or circumstantial evidence." *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 576 (5th Cir. 2003). "As direct evidence of copying is rarely available, factual copying may be inferred from (1) proof that the defendant had access to the copyrighted work prior to creation of the infringing work and (2) probative similarity."[6] *Peel & Co. v. The Rug Mkt.*, 238 F.3d 391, 394 (5th Cir. 2001). Even when a plaintiff establishes an inference of factual copying, "the defendant can rebut that inference, and thus escape liability for infringement, if he can prove that he independently created the work." *Positive Black Talk*, 394 F.3d at 368.

There is one situation, however, in which proof of access is not required. As the Fifth Circuit has explained, a "plaintiff may establish factual copying without

---

[5] The parties do dispute whether the registered copyright protects the same melody as the one heard on the recorded version of *Triste*. Because of the Court's finding on access, the Court need not resolve that issue.

[6] The Second Circuit has explained the difference between probative similarity, which informs the circumstantial access inquiry, and substantial similarity, which is a separate element requiring the degree of similarity necessary to establish copying: "The former (probative similarity) requires only the fact that the infringing work copies something from the copyrighted work; the latter (substantial similarity) requires that the copying is quantitatively and qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred." *See Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 75 (2d Cir. 1997). Although the Court need not reach this issue, the Court easily would have concluded that Guzman showed probative similarity between *Triste* and *Cartas*.

any proof of access 'when the similarity between plaintiff's and defendant's work is sufficiently striking such that the trier of fact may be permitted to infer copying on that basis alone.'" *Positive Black Talk*, 394 F.3d at 371 n.10. This means that "the similarity could only be explained by actual copying." *Armour v. Knowles*, 512 F.3d 147, 152 n.3 (5th Cir. 2007) (also citing *Selle v. Gibb*, 741 F.2d 896, 904 (7th Cir. 1984) for the proposition that the similarity must be "of a kind that can only be explained by copying, rather than by coincidence, independent creation, or prior common source"). This requires some evidence of the "uniqueness or complexity" of the copyrighted song, "particularly . . . with respect to popular music, 'in which all songs are relatively short and tend to build on or repeat a basic theme.'" *See Benson v. Coca-Cola Co.*, 795 F.2d 973, 975 n.2 (11th Cir. 1986) (citing *Selle*, 741 F.2d 896); *see, e.g.*, *Watt v. Butler*, 744 F. Supp. 2d 1315, 1323–24 (N.D. Ga. 2010) *aff'd*, 457 F. App'x 856 (11th Cir. 2012) (holding that even a 67% match in total notes, which excludes the transitional sequences, was not sufficient to demonstrate striking similarity). As its name suggests, striking similarity is a "stringent" standard. *See Gal v. Viacom Int'l, Inc.*, 518 F. Supp. 2d 526, 537–38 (S.D.N.Y. 2007) (citing another district court case that found no striking similarity despite a finding of substantial similarity).

Although the Court believes that substantial similarity exists between the songs,[7] the Court declines to find the much higher standard of striking similarity. *Cartas* and *Triste* are songs within the same musical genre—indeed, the same subgenre—of Tejano music. Many Tejano songs, like the two at issue here, utilize the same types of lyrical themes, rhythms, and instrumental accompaniment. The common genre that both songs share thus undercuts Guzman's argument that *Triste* is particularly unique or complex. And there are differences in both the lyrics and the music of the songs that prevents the Court from concluding that the only possible explanation for their similarity is copying.

Before examining the evidence of access, there is one other issue to consider: does a degree of similarity that is strong but not striking lessen (as opposed to eliminate) the showing needed to prove access? Without expressly adopting the position, the Fifth Circuit has noted that other circuits follow the principle that "there is an inverse relationship between access and similarity such that the stronger the proof of similarity, the less the proof of access is required." *See Positive Black Talk*, 394 F.3d at 371–72 (quoting *Swirsky v. Carey*, 376 F.3d 841, 844–45 (9th Cir. 2004) and *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 56 (2d Cir. 2003)); *see also* MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON

---

[7] The Court reaches this conclusion based on the extensive expert testimony concerning the songs and its own review of the songs. There is no need to detail this finding, however, because Guzman's inability to prove access means a full ruling on the "substantial similarity" element is unnecessary.

COPYRIGHT § 13.03[D], at 13–90 ("[T]he stronger the proof of similarity, the less the proof of access is required"). That sliding scale makes sense when the accused infringer created the work, the idea being that it is too coincidental that two creators would have had the same spark of ingenuity. But it does not make sense to relax the access requirement based on a strong similarity in a case like this one, in which the defendants are the record company and its managers who recorded the song and not anyone who wrote it.[8] Hacienda's act of recording *Cartas* would amount to copying only if it was aware of *Triste*, so the ordinary standard for establishing access should apply.

## 2. Access

The Fifth Circuit has defined access as "an opportunity to view the copyrighted work." *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 113 (5th Cir. 1978). To support a finding that the defendant had an opportunity to view the copyrighted work, there must be a "reasonable possibility of access." *Id.*; *see also Peel*, 238 F.3d at 394–95 (affirming *Ferguson*'s access test). A reasonable possibility of access requires more than mere "speculation or conjecture." *See*

---

[8] The same reasoning would seem to preclude application of the "strikingly similar" standard, with its elimination of the need to show access, to a defendant who merely recorded a song. That standard, however, has been adopted by the Fifth Circuit without making this distinction. So the above discussion of "strikingly similar" assumed its applicability to even a recorder of a song, although it found the standard not satisfied by the songs at issue. Because the "sliding scale" approach of lessening the proof needed to show access has not been officially adopted by the Fifth Circuit, the Court thinks it appropriate to rely on the creator/recorder distinction in deciding whether to apply a doctrine that the circuit has only suggested may apply.

*Ferguson*, 584 F.2d at 113; *see also* NIMMER § 13.02[A], at 13–22 (explaining that access "does not encompass any bare possibility in the sense that anything is possible").[9] At least one court has adopted the following helpful framework: a party "can establish access either by demonstrating that (1) the infringed work has been widely disseminated, or (2) a particular chain of events exists by which the alleged infringer might have gained access to the copyrighted work."[10] NIMMER § 13.02[A], at 13–26 (quoting *Repp v. Webber*, 947 F. Supp. 105, 114 (S.D.N.Y. 1996) *aff'd*, 132 F.3d 882 (2d Cir. 1997)). A "nationwide, saturation radio campaign would fit the former paradigm, whereas a small circulation periodical or local air time would fit the latter." *Id*. at 13–27.

*Triste*, which did not achieve popularity outside of the Tejano music scene, was not widely disseminated. *Compare ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 998 (2d Cir. 1983) (finding possibility of access when song was "'Number One on the *Billboard* charts' in the United States for five weeks,

---

[9] Guzman's argument that copyright infringement is a "strict liability" tort—and thus that he need not show access at all—is not the current state of the law. Courts have observed that "copyright infringement is a strict liability tort," but only to indicate that plaintiffs do not need to prove a defendant's mental state to prosecute a copyright claim. *See Educ. Testing Serv. v. Simon*, 95 F. Supp. 2d 1081, 1087 (C.D. Cal. 1999). That observation—an accurate one—does not negate the access requirement that, as discussed above, is foundational to copyright infringement claims.

[10] Although the Fifth Circuit in *Peel* did not expressly adopt either of these theories of access, it did not disapprove of using either theory as a general approach. 238 F.3d at 396. The Court merely determined that *Ferguson*'s "reasonable possibility of access" test was sufficient to resolve the facts before it concerning the defendant's access to plaintiff's products. *Id.* The Court concludes that the "dissemination/chain of events" framework above—which Nimmer has endorsed—is illustrative for purposes of analyzing access, which under *Ferguson* and *Peel* ultimately comes down to the basic question of determining a "reasonable possibility of access."

and it was one of the 'Top Thirty Hits' in England for seven weeks that same year"), *with Feldman v. Twentieth Century Fox Film Corp.*, 723 F. Supp. 2d 357, 365–66 (D. Mass. 2010) (holding that plaintiff's appearance on a local radio station was insufficient alone to show widespread dissemination), *and Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1144 (9th Cir. 2009) (holding that plaintiff's evidence that 2,000 of its t-shirts were sold per year did not allow plaintiff to demonstrate that its designs "were widely disseminated to the extent necessary to create more than a 'bare possibility' that [the defendant] had access to the designs").

Just as it did in *Peel*, 238 F.3d at 395–97, the access question in this case turns on whether the totality of the evidence presents a "reasonable possibility" that Hacienda could have heard *Triste* before recording *Cartas*. Guzman concedes that there was no smoking gun at trial showing direct access—no admission from Rick Garcia that he attended a Los Duendes show, for instance. But he contends the Court can and should find access because *Triste* was performed in and around the Corpus Christi area in the 1970s through the 1990s, appeared on the radio in Corpus Christi, and was performed a handful of times in Lubbock.

The Court disagrees that the evidence supports an access finding. First, the evidence about radio play that Guzman introduced is problematic because it is unclear how often, if at all, *Triste* received radio play. Both Guzman and Sanchez

15

testified that *Triste* was played on three radio stations, but they also acknowledged that it was not played very frequently—perhaps only once a day. And both were hazy on the time frame during which it was played. At a minimum, they seemed certain that it was played in the mid-1970s (when Hacienda was not in existence and Rick Garcia was still in high school)[11], but it is less clear that the song received much, if any, airplay in the 1980s when Hacienda began recording Tejano music. And Guzman has introduced no evidence to corroborate his testimony that the song was popular enough that radio stations would play it into the 1980s. *Triste* did not appear to sell any records, receive any awards, or chart on the radio. This is unsurprising in light of *Cartas*'s failure to gain much traction in the Tejano music scene. Based on these uncertainties, the Court concludes that it is purely speculative that anyone associated with Hacienda heard *Triste* on the radio on the occasions when it was actually played. *Cf. Intersong U.S.A. v. CBS, Inc.*, 757 F. Supp. 274, 281 (S.D.N.Y. 1991) ("'Es' may have been played on the radio in New York and Miami in 1979 when [the defendants] were in those cities, but there is an insufficient basis to conclude that any of them heard the song at that time.").

Thus, the main evidence from which Guzman might be able to show access is that he performed *Triste* with Los Duendes in Corpus Christi between 1974 and

---

[11] The access discussion examines Rick Garcia's knowledge of *Triste* because he was involved in the recording of *Cartas* and his knowledge was the focus at trial. Plaintiff, who bears the burden on the access issue, did not produce evidence to establish that others at Hacienda, such as Roland Garcia Sr., had heard *Triste* to allow the conclusion that Hacienda's recording of *Cartas* amounted to copying.

1990.  But the Court finds these performances insufficient to establish access for several reasons.  *Triste* was copyrighted in 1974, and Timo Martinez testified that fans requested *Triste* in concerts—in other words, that the song hit its peak popularity—between 1974 and 1975.  Docket Entry No. 120 at 197:8–14.  No other witness testified with such certainty as to the dates *Triste* was popular, and for that reason, the Court places particular emphasis on Martinez's testimony.  His recollection also coincides with the commonsense proposition that a song would be most popular in the first few years after it is written, released, and performed.  That is what happens in popular music all the time.  A song peaks on the radio, then gradually fades.  And songwriters like Guzman, who "was just born with [music] in [his] head," *id.* at 65: 4–5, move on to write and perform other songs.

In the mid-1970s, Rick Garcia was still in high school in Weslaco, Texas, and Hacienda had not even been founded.  Docket Entry No. 121 at 166:13–16.  The Court cannot find a reasonable possibility that anyone associated with Hacienda heard *Triste* in the mid- to late-1970s, before the company was founded and, for the most part, before its day-to-day manager even lived in Corpus Christi.

The evidence that Guzman and Los Duendes performed *Triste* in Corpus Christi from the early 1980s through the early 1990s is also insufficient.  Again, Martinez testified that *Triste* was mainly requested by fans in the mid-1970s.  And *Cartas*—a song Guzman contends is substantially similar to *Triste*—failed to gain

17

any sort of popularity at concerts or on the record charts. Docket Entry No. 122 at 65:24–66:5. Although Sanchez and Guzman both maintained that the song was popular throughout the 1980s, Guzman also hesitated and at one point appeared to indicate that the song was mostly popular before 1980. *See* Docket Entry No. 120 at 77:15–20 (Guzman testifying that Los Duendes performed *Triste* "from '74 to '80, around that, more or less"). Of course, it is perfectly understandable that Guzman might not recollect in perfect detail when and where he performed *Triste* with Los Duendes. And the Court generally finds him a persuasive witness. But on this point, the Court views Martinez as the more credible source about when *Triste* was popular at concerts. For that reason, and the others mentioned above, the Court concludes that even though Hacienda and Guzman were both active in Corpus Christi in the same time frame, the evidence is insufficient to show that Hacienda had a "reasonable possibility of access" to *Triste* before 1990, the year it recorded *Cartas*.

Furthermore, the Court credits Rick Garcia's testimony that before this lawsuit Hacienda never saw Guzman perform or otherwise heard *Triste*. There was no evidence at trial, direct or otherwise, that casts doubt on the veracity of his testimony. *Cf. Intersong*, 757 F. Supp. at 281–82 ("Each of these defendants denies having heard 'Es' prior to the commencement of this suit. The Court has been given no reason to doubt the veracity of these representations.").

Because Guzman has not shown a reasonable possibility that Defendants had access to his song, he cannot show that they copied it and his copyright infringement claim fails.

**B. Digital Millennium Copyright Act Claim**

The same analysis resolves Guzman's separate claim under section 1202(a) of the Digital Millennium Copyright Act (DMCA). That statute provides that:

> "No person shall knowingly and with the intent to induce, enable, facilitate, or conceal infringement—
> (1) provide copyright management information that is false, or
> (2) distribute or import for distribution copyright management information that is false."

17 U.S.C. § 1202(a). Guzman claims that Hacienda violated this provision of the DMCA by releasing *Cartas* on its records without properly crediting him. Haicenda argues that labels on a record do not constitute "copyright management information" under the DMCA. But the Court need not resolve that issue. The Court's holding on access necessarily means that Guzman has not shown that Hacienda knew about *Triste* when it released *Cartas*. Guzman therefore cannot show the "intent" requirement that the DMCA plainly requires. Accordingly, the Court denies Guzman relief on his DMCA claim.

**III. CONCLUSION**

This was an emotional case for the parties. The Court does not suggest that Guzman was wrong to bring this suit; the similarities he identified between

*Triste*—a song he obviously cares a great deal about—and *Cartas* are troubling. This case turns, however, on whether Hacienda and the people who worked there knew of *Triste* when they recorded *Cartas* to allow the conclusion that they—as opposed to perhaps someone else involved with *Cartas*—were engaged in copying. For the reasons explained above, the Court's answer to that question is no. Accordingly, Plaintiff Jose Guzman will take nothing in his suit against the Defendants.[12]  Final judgment will issue by separate order.

**SIGNED** this 9th day of December, 2014.

_____
Gregg Costa
United States Circuit Judge[*]

---

[12] Guzman's Motion for Attorney's Fees (Docket Entry No. 125), which could only be granted if Guzman were the prevailing party, is **DENIED**. Hacienda's motion objecting to Guzman's proposed findings of fact (Docket Entry No. 128) is **DENIED** as moot. The Court reserves ruling on Roman Martinez, Sr.'s Motion for Attorney's Fees (Docket Entry No. 131).

[*] Sitting by designation.